Marquiz Law Office
Professional Corporation

3088 Via Flaminia Court
Henderson, NV 89052
Phone: (702) 263-5533
Fax: (702) 263-5532
Craig A. Marquiz, Esq.
NV Bar #7437

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| JOSEPH B. COE; | Case No.: |
| Plaintiff, | |
| v. | |
| NAV-LVH, LLC, a Nevada Limited Liability Company; DOES 1 through 100, inclusive; and ROE CORPORATIONS 1 through 100, inclusive, | **COMPLAINT &**<br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMES NOW Plaintiff Joseph B. Coe ("Coe"), by and through his counsel of record, Craig A. Marquiz, Esq. of the Marquiz Law Office, P.C., and for his claims against Defendant NAV-LVH, LLC., doing business as Westgate Las Vegas Resort & Casino, (hereinafter "Westgate"), avers and alleges as follows:

## JURISDICTION & VENUE

1.     This Court possesses original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 as Plaintiff's claims arise out of Defendant Westgate's violations of federal law, including, without limitation, Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. 2000e-2(a)(1), the Civil Rights Act of 1991, 42 U.S.C. 1981a, the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, *et seq*. ("ADEA"), and the Older Workers Benefit Protection Act of 1990, 29 U.S.C. § 623.

2.    This Court also possesses supplemental jurisdiction over Plaintiff Coe's state-law claims pursuant 28 U.S.C. § 1367 as those claims form part of the same case or controversy as the aforementioned jurisdictional granting claims.

3.    Venue of this matter is properly before this Court as the underlying employment actions, causes of action and corresponding damages are alleged to have occurred within this forum.

## PARTIES

4.    Plaintiff Coe is, and at all material times was, a Nevada domiciliary who was previously employed by Defendant Westgate from October 17, 2022 through December 15, 2022, and prior to his termination served as the Vice President of Team Member Services at the Westgate Las Vegas Resort & Casino.

5.    Defendant Westgate is, and at all material times was, a Nevada Limited Liability Company authorized to do and doing business in Clark County, Nevada, and which caused acts and events to occur within this forum from which Plaintiff's claims arose.

6.    Coe is informed and believes and thereon alleges that each of the Defendants designated herein as DOES 1 through 100 are the principals, agents, employees, servants or partners of each other or were otherwise acting under the direction and control of Defendant Westgate and/or ROE CORPORATIONS 1 through 100, inclusive.  The true names and capacities, whether individual, corporate, associate or otherwise of DOES 1 through 100 and ROE CORPORATIONS 1 through 100, inclusive, are unknown to Coe at this time, who therefore sues said Defendants by such fictitious names.  When the true names and capacities of said Defendants are ascertained, Coe will seek leave to amend his Complaint to identify the true names and capacities of said Defendants.

## GENERAL ALLEGATIONS

7.    Coe fully incorporates herein by reference all allegations contained in paragraphs 1 through 8 of this Complaint.

8.    By way of background, from October 17, 2022 through December 15, 2022, 2019, Coe, an African-American male executive within a protected age class) was an

2

exemplary employee for Defendant Westgate; namely, one whose leadership and focus resulted in positive changes and progress within his Department – changes that he was specifically hired to develop and implement.

9. Notably, Coe was heavily recruited from Boyd Gaming by Cami Christensen (Westgate's President & General Manager) and empowered by her as a "change agent" at Westgate to improve workplace productivity and motivate employees with known performance issues.

10. During his tenure, Coe managed his Department exceptionally by, among other things, streamlining the Department's policies and procedures, opening lines of communication throughout the organization to improve Team Member Service functions, dramatically improving worker accountability and reporting requirements, and providing a level of professionalism that was lacking prior to his term.

11. Notably, the changes implemented by Coe drastically improved the overall effectiveness and efficiency of the Team Member Services Department and contributed to the financial success that Westgate experienced.

12. Coe's strategic focus and exemplary management style did not go unnoticed – the positive changes he implemented were repeatedly acknowledged by Christensen and for which she offered praise, noting that she "was confident" with what Coe was doing and the manner in which he was effectuating those changes.

13. Things drastically changed, however, when Coe uncovered evidence from Westgate's benefits department that Karl Johnson (Coe's predecessor, a white male), contrary to Christensen's prior representations that Johnson was on unpaid medical leave under the Family Medical Leave Act), was still receiving benefits from Westgate for services that were actively being performed by him on "special assignment" in direct violation of various federal and state employment laws.

14. When Coe confronted Christensen with that information, she: (a) instructed Coe to allow Johnson to continue providing "Coaching and Discipline" training for Guest Room Attendants through December 2022; (b) admitted that she had been paying Johnson gift cards

3

loaded with cash for those services; and (c) that she would continue doing so through December 31, 2022.

15.    With regard to Johnson's "special assignment" role, Coe uncovered that Johnson was interacting with his former (and Coe's current) employees – interactions which irrefutably created an outlet for Department employee's to resist the changes initiated by Coe.

16.    Shortly thereafter, Johnson made an unexpected visit to Coe's Department to relay that two disgruntled, non-performing female employees had alleged that Coe had created a "hostile work environment" and had engaged in "abusive / inappropriate" conduct.[1]

17.    Tellingly, Christensen and Johnson, each of whom has a labor / employment-relations background, knew that these disguised and unreported payroll payments to Johnson (while he was on FMLA) were in contravention of various Federal and State employment and taxation laws.

18.    Recognizing that they had engaged in inappropriate conduct in direct violation of Westgate's policies and procedures, along with Federal and State employment and taxation laws, Christensen and Johnson conspired together and orchestrated Coe's termination of employment. Notably, Christensen and Johnson used the two non-performing female employees and their Trojan Horse to effectuate that plan (employees who were allowed to retain their jobs for their role in Christensen's and Johnson's calculated plan).

19.    In particular, although Westgate conducted a cursory "investigation" regarding the alleged "hostile work environment" and "abusive / inappropriate" conduct, a full, fair and complete investigation was not conducted. For example. That "investigation," however, failed to uncover any facts regarding the circumstances which motivated the alleged complaint as Coe

---

[1]    Coe previously worked with Johnson at Boyd Gaming. Both men were employed as Directors of Human Resources: Johnson specializing in Labor Relations and Coe emphasizing workforce and supply-chain diversity. At Boyd Gaming, Johnson advanced an egregious complaint against Coe concerning inappropriate conduct of which Coe was completely exonerated. Johnson, by comparison, was ridiculed by Boyd Gaming executives for having falsely accused Coe of any wrong-doing. To that end, in Johnson's last days of employment at Westgate and during a transition / changing of the guard meeting with Coe (who was replacing him as the Vice President of Human Resources), Johnson stated to Coe that, "I hope you do a better job than I did, because I hold grudges."

was never: (a) interviewed; (b) advised of the specific allegations prompting his termination; (c) given the opportunity to respond to the specious allegations; nor otherwise (d) afforded an opportunity to enlighten the investigator regarding the true circumstances prompting his termination so that upper management could be apprised accordingly and appropriate measures to protect him as a whistleblower.

20. Notably, the alleged "sexist" complaint (advanced by a long-time friend and colleague of Coe who regularly shared updates with him on their respective family members and lives) was made *after* Coe disclosed to her his plan to make two other executives (i.e., the Vice President of Hotel Operations, a female, and the Executive Director of Finance, a male) -- an integral part of his Westgate-wide HR Strategic Plan. Tellingly, as part of that plan, the complainant (who begrudgingly worked with the Vice President of Hotel Operations and only did so if she was forced or otherwise required by management to do so) knowingly would be subordinate to the female executive on a going forward basis.

21. Further, one of the themes that Coe was endeavoring to correct was the widespread gender discrimination and favoritism that ran rampant throughout the organization – discriminatory conduct that emanated from Ms. Christensen herself as evidenced by, among other things, her directive for Coe to perform an executive search for an open Chief Financial Officer position and for him to not bring her any female candidates to evaluate as she already had enough women in executive positions.

22. Consequently, a complete picture of the actual landscape was never achieved as the aforementioned issues were never addressed nor the motivation behind the alleged complainants' specious allegations considered.

23. Even more troubling, however, Westgate failed to follow its own progressive discipline policy or otherwise offer sensitivity training prior to terminating Coe – employment practices followed by Westgate for non-minority employees and executives for whom similar allegations were raised.

24.    For example, Westgate's "Standards of Conduct" policy expressly encompasses the application of a progressive discipline policy approach for, among other things, violations of Westgate's policies. Notably, that policy provides:

Out of respect for our guests and each other, team members are expected to maintain certain behavior and performance standards. *The following is a list of behaviors that may result in coaching and counseling, up to an including immediate termination of employment*; it is not intended to be an exhaustive list and Management reserves the right to determine the appropriate level of discipline to be issued for policy violations. At all times, team members are expected to use good judgment in determining appropriate behavior at work. Since employment is "at-will," Management has the right to terminate employment at any time, with or without reason, with or without following this process.

1. Violations of any of the policies and procedures as outlined in this Handbook.

2. Rude, malicious, discourteous, offensive, abusive, intimidating, unprofessional, conduct / behavior or language toward guests or co-workers.

30. Violation of the Company's Illegal Harassment or Discrimination policies.

The above Westgate Las Vegas Resort & Casino Standards of Conduct are not intended to be an exhaustive listing. Management reserves the right to determine the appropriate level of discipline to be issued for policy violations, some of which are outlined above. Where appropriate, Management may use the following Coaching and Counseling Procedure. Based on the severity and the specific facts of the incident, the disciplinary process may be accelerated to final written warning and/or immediate termination of employment. Management is not obligated to use this procedure. If used, the following steps may be followed:

- First Step    -    Documented Coaching
- Second Step    -    Written Warning
- Third Step    -    Final Written Warning
- Fourth Step    -    (1) to (3) Days Disciplinary Suspension
- Fifth Step    -    Termination of Employment

25.    Westgate's Coaching & Counseling policy further provides:

Westgate Las Vegas Resort & Casino believes that all of our team members support the objectives of our organization. We provide training and performance management to all team members to make sure our Company goals and objectives, the requirements of each job and all the other criteria for success are clearly communicated.

When a team member's job performance, behavior or actions are not in compliance with Company policies or standards of performance as determined by the Company, appropriate corrective action will take

6

Place based upon the nature and circumstances of the infraction, and the team member's history of service.

Coaching and counseling may be written and could result in a Team member being suspended without pay or separated. All such action is documented, and a record is placed in the team member's file.

26. To that end, Westgate had an established pattern of providing Coaching & Counseling services being offered to non-minority executives for having engaged in discriminatory conduct / offenses (i.e., coaching and counseling / sensitivity training were provided to these non-minority executives, each of whom retained his or her jobs), contrary to the position Westgate took with Mr. Coe (a minority who uncovered unlawful conduct by senior executives at the Company who, in turn, fabricated charges and orchestrated his termination of employment).

27. Further, in accordance with his rights under NRS 613.075, on January 4, 2023, Coe made a demand upon Defendant Westgate for the production of his employment file, including, without limitation, all non-privileged documentation referencing, regarding or relating to Westgate's termination decision.

28. Notwithstanding that request, Defendant Westgate failed, refused or otherwise neglected to produce those records and, to date, has yet to provide same in contravention of NRS 613.075.

29. As a direct, proximate and foreseeable cause of Defendant Westgate's egregious conduct, Coe's honor, integrity and reputation were irrefutably tarnished and, even more troubling, Coe was deprived of, among other things: (a) finishing his career at Westgate (i.e., working another 5 years and earning at least $190,000 per year); (b) accrued and accruing interest on all such sums, until paid in full; and (c) all such other and further relief as this Court deems just and proper under the circumstances.

30. Further, as a direct, proximate and foreseeable cause of Defendants conduct, Coe has been required to retain the services of an attorney to pursue his affirmative claims for relief and, therefore, is entitled to reasonable attorney's fees and costs incurred in the prosecution of this action, plus, post-judgment attorney's fees and costs.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

31.    Coe exhausted all available administrative remedies as a precursor to instituting the instant civil action.

32.    Notably, following his termination and within the time provided by applicable law and regulation, Coe filed a formal complaint with the Nevada Equal Rights Commission ("NERC") and the Equal Employment Opportunity Commission ("EEOC").

33.    In that complaint, Coe averred, among other things, that he was wrongfully discharged because of his race (African American) and age (over 40), while others, not of his protected class, were not discharged or otherwise reprimanded for similar allegations had been advanced.

34.    On March 7, 2024, the EEOC issued a Notice of Right to Sue letter.

35.    This action has been timely filed within ninety (90) days of Coe's receipt of the EEOC's notice of final agency administrative action and, thus, is ripe for adjudication.

## FIRST CAUSE OF ACTION
### (Employment Discrimination - Race)

36.    Coe fully incorporates herein by reference all allegations contained in paragraphs 1 through 35 of this Complaint.

37.    Coe, an African American male, is member of a protected class.

38.    Defendant Westgate maliciously and/or recklessly discriminated against Coe on the basis of his race by terminating his employment from the Company on the pretense of an improper, sexist comment have been made when other executives, not of his protected class, for whom similar allegations had been made were treated differently (e.g., they were not suspended, terminated or otherwise disciplined by the Company).

39.    Notably, as the only African American executive and member of Defendant Human Resource / Team Member Services Department during his term of employment, Coe was singled-out, discriminated against and treated differently than his non-minority executive counterparts in violation of the terms and conditions of Plaintiff's employment, Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, and Nevada Revised Statute ("NRS") 613.330.

8

40. As a direct, proximate and foreseeable cause of Defendant Westgate's egregious conduct, Coe sustained, and continues to incur, compensatory damages in amounts to be established at trial, but which include, without limitation, inconvenience, injury to his professional standing, and damage to his character and reputation.

41. Further, Defendant Westgate's conduct was, and is, evil, intentional, grossly improper, and performed with a conscious disregard for Plaintiff's rights and, as a result, Coe is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Employment Discrimination - Age)

42. Coe fully incorporates herein by reference all allegations contained in paragraphs 1 through 41 of this Complaint.

43. Coe, who was 58 years old at the time of his termination, was a member of a protected class.

44. Defendant Westgate maliciously and/or recklessly discriminated against Coe on the basis of his age in violation of the terms and conditions of his employment, the ADEA of 1967, 28 U.S.C. § 621, the Older Workers Benefit Protection Act of 1990, 29 U.S.C. § 623, and NRS 613.330.

45. Notably, Defendant Westgate failed to apply or otherwise follow the Company's stated policies regarding, among other things, progressive discipline; and, due to his age, Westgate subjected Coe to harsh and unreasonable standards not previously applied by the Company when it addressed identical issues and reached inconsistent results.

46. As a direct, proximate and foreseeable cause of Westgate's egregious conduct, Coe sustained, and continues to incur, compensatory damages in amounts to be established at trial, but which include, without limitation, inconvenience, injury to his professional standing, and damage to his character and reputation.

47. Further, Defendant Westgate's conduct was, and is, evil, intentional, grossly improper, and performed with a conscious disregard for Plaintiff's rights and, as a result, Coe is entitled to an award of punitive damages.

9

### THIRD CAUSE OF ACTION
**(Tortious Discharge - Violation of Public Policy)**

48.     Coe fully incorporates herein by reference all allegations contained in paragraphs 1 through 47 of this Complaint.

49.     In Nevada, a wrongful termination claim provides a former employee with a remedy where, as here, an employer has wrongfully terminated that employee's employment in violation of public policy.

50.     Here, Defendant Westgate pretextually applied its Anti-Discriminatory Policy in a disguised attempt to undermine Coe's ability to further investigate and report the unlawful employment practices being followed at Westgate, including, without limitation, Christensen's surreptitious payment via gift cards loaded with cash to Coe's predecessor (who allegedly was on "special assignment" despite being on a leave of absence) for his continued involvement with Team Service functions.

51.     Notably, an employer tortiously discharges an employee when, as here, it retaliates for an employees actual or threatened exercise of labor and employment rights which are consistent with, or otherwise supportive of, sound public policy and the common good.

52.     Defendant Westgate's retaliatory termination of Coe for his anticipated whistle-blowing of Westgate's unlawful employment practices was contrary to the sound public policy of the State of Nevada and its declared prohibition against such unlawful employment practices including, without limitation, those under NRS 613.330 and NRS 613.340.

### JURY DEMAND

Coe demands a trial by jury on all claims asserted herein.

**WHEREFORE**, Coe prays for Judgment in his favor and against Defendant Westgate as follows:

A.      For monetary damages in an amount to be proven at trial;

B.      For punitive damages according to proof at trial;

C.      For pre-judgment interest on all such sums;

D.    For Plaintiff's reasonable attorney's fees and taxable costs, including, without limitation, those attorney's fees and costs incurred herein; and

E.    For all such other and further relief as this Court deems just and proper under the circumstances, including, without limitation, post-judgment attorney's fees and costs.

Dated this 22nd day of April, 2024.



Marquiz Law Office
Professional Corporation

By: /s/ Craig A. Marquiz, Esq.
Craig A. Marquiz, Esq.
3088 Via Flaminia Court
Henderson, NV 89052
Attorney for Plaintiff

11